**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

TERRY LEE DITTERLINE, )
)
Plaintiff, )
)
vs. ) Case No. 16-cv-00907-JPG-CJP
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
Defendant.[1] )

**MEMORANDUM and ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff Terry Lee Ditterline (plaintiff), represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff filed for DIB on July 30, 2012, alleging a disability onset date of July 18, 2011. (Tr. 168–74.) Plaintiff's claim was initially denied on November 5, 2012, and again upon reconsideration on April 3, 2013. (Tr. 96–100, 103–06.) Administrative Law Judge (ALJ) Stuart Janney conducted an evidentiary hearing and later issued an unfavorable opinion on January 5, 2015. (Tr. 14–24.) The Appeals Council denied plaintiff's request for review and the ALJ's decision became the final agency decision. (Tr. 2–4.) Plaintiff exhausted his administrative remedies and filed a timely complaint with this Court. (Doc. 4.)

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. See *Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

1. The ALJ's RFC assessment was erroneous.

2. The ALJ erred in not developing the VE's testimony at the evidentiary hearing.

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the Commissioner made no mistakes of law and that decision is supported by substantial evidence. This scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but only whether the ALJ's findings were supported by substantial evidence and that the ALJ made no mistakes of law. See, *Books v. Chater*, 91 F.3d 972, 977–78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d

300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence: "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). While judicial review is deferential, however, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Janney followed the five-step analytical framework set forth above. He determined plaintiff met the insured status requirements through December 31, 2014 and had not engaged in substantial gainful activity since July 18, 2011. The ALJ also opined plaintiff had severe impairments of bilateral shoulder osteoarthritis; hemangioma at C3 of the cervical spine; a left arm neurological defect variously diagnosed as monoeuritis; Parson-Turner Syndrome; subscapular neuropathy; axonal neuropathy; cervicobrachial syndrome; brachial plexus lesions; and thoracic outlet syndrome. (Tr. 16.)

ALJ Janney determined plaintiff had the RFC to perform light work with various restrictions. Although plaintiff was unable to perform past relevant work, the ALJ found plaintiff could perform other jobs that existed in the economy. He was, therefore, determined not disabled. (Tr. 18–24.)

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this

Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

   1.   **Agency Forms**

Plaintiff alleged in the agency forms that depression, arthritis, rotator cuff injuries, and issues with his left suprascapular nerve prevented him from working. (Tr. 197.) He stated that he was unable to lift anything and had limited motor skills due to a lack of nerve function and muscle deterioration. His conditions weakened his upper body and he experienced chronic pain. Plaintiff had difficulty dressing and required assistance with everyday tasks. There were days when plaintiff was unable to get out of bed due to pain. (Tr. 206.)

Plaintiff could not wash his hair, he had barriers using a knife and nail clippers, and he needed assistance with shaving. He heated pre-made and frozen meals approximately two to three times each week, but he could not prepare a meal on his own. Plaintiff was unable to do house or yard work. He attempted to complete physical therapy each day, but the movement caused him a lot of pain. His conditions prevented him from partaking in social activities. He could walk about fifty yards before needing to rest. He got along "limitedly" with authority figures. (Tr. 218–23.) In a subsequent disability report, plaintiff alleged his condition worsened. (Tr. 238.)

Plaintiff's highest level of education was the twelfth grade. He also received training in truck driving. Plaintiff previously worked as a laborer, mill room operator, welder/pipe fitter, deckhand, truck driver, brick setter, and in national maintenance. (Tr. 198, 229.)

Plaintiff's wife, Delana Ditterline, filed a third-party function report on August 31, 2012 and February 21, 2013. Her reports corroborated plaintiff's allegations regarding his symptoms. (Tr. 208–215, 254–61.)

   2.   **Medical Records**

Plaintiff presented to Memorial Hospital of Carbondale on July 18, 2011 for left shoulder pain. He received a diagnosis of a left shoulder strain and a prescription for Vicodin and Norflex. (Tr. 327–32.)

On August 15, 2011, plaintiff presented to Dr. Matthew Bayes for an initial evaluation of left shoulder pain. A physical examination revealed significant tenderness over the AC joint and anterior and posterior should pain. Plaintiff's range of motion was severely limited and he had significant cross-arm adduction and circumduction test pain. He demonstrated significant pain with Neer's and Hawkin's testing. Strength testing revealed weakness with external rotation. Plaintiff had no pain in either the O'Brien's test or load-and-shift test. He was neurovascularly intact in his left upper extremity. Dr. Bayes recommended an aggressive non-operative approach consisting of a glenohumeral and AC joint steroid injection, followed by an anti-inflammatory. He also recommended range of motion work with physical therapy. Dr. Bayes administered the injections without complication. (Tr. 416–17.)

Plaintiff treated with Dr. George Paletta at the Orthopedic Center of St. Louis throughout the relevant period. (Tr. 334–38.) Dr. Paletta initially evaluated plaintiff on September 12, 2011 and noted plaintiff experienced pain in his left shoulder and an inability to fully and actively externally rotate the arm. Plaintiff's symptoms dated back to July 2011. Dr. Paletta diagnosed plaintiff with probable suprascapular neuropathy of the left shoulder and recommended an EMG and nerve conduction studies. Dr. Paletta noted plaintiff had significant supraspinatus and infraspinatus dysfunction as well as atrophy and marked weakness. He opined plaintiff's symptoms were neurogenic in origin. (Tr. 337–38.)

Plaintiff attended a follow-up appointment with Dr. Paletta on September 19, 2011. Dr. Paletta diagnosed plaintiff with severe suprascapular neuropathy after reviewing the EMG and the nerve conduction studies. He recommended blood work as well as Lyrica for plaintiff's pain.

6

(Tr. 336.)

On September 30, 2011, Dr. Paletta reviewed plaintiff's bloodwork and determined plaintiff most likely had Parsonage-Turner Syndrome. He recommended a follow-up in three months, and a repeat EMG and nerve conduction studies. (Tr. 335.)

On December 19, 2011, plaintiff presented to Dr. Phillips for nerve conduction studies and an EMG. Dr. Phillips noticed no change in plaintiff's symptoms or physical examination. Plaintiff demonstrated atrophy of the left suprascapular distribution and the studies remained consistent with severe complete left suprascapular axonal neuropathy. (Tr. 348–49.)

Dr. Paletta reviewed plaintiff's EMG and nerve conduction studies on December 22, 2011. The results demonstrated complete left suprascapular axonal neuropathy with no improvement. He referred plaintiff to Dr. Susan MacKinnon for further treatment. (Tr. 334.)

On January 26, 2012, plaintiff presented to Dr. Susan MacKinnon at Barnes Jewish Hospital. On examination, plaintiff demonstrated no suprascapular nerve function in the left; his pinch and grip on the right was 28 pounds and 105 pounds; and his pinch and grip on the left was 14 pounds and 70 pounds. Dr. MacKinnon discussed a transfer of redundant pectoral nerves from plaintiff's middle trunk to his suprascapular nerve, along with decompression of the brachial plexus. (Tr. 375.)

On March 12, 2012, plaintiff presented to Dr. Phillips for consultative left upper extremity electrical diagnostic studies. There were no changes in his symptoms or physical examination. Plaintiff demonstrated complete atrophy of his left supraspinatus and infraspinatus. Dr. Phillips noted an isolated nascent motor unit recordable from the supraspinatus that was not previously present. He recommended a repeat study in two to three months. (Tr. 344.)

On March 20, 2012, plaintiff underwent a left brachioplexus exploration with nerve transfer. (Tr. 370-71.) He followed up with Dr. MacKinnon on April 2, 2012. She noted

7

plaintiff was "doing well" but could "basically do nothing for a month." (Tr. 362.) On May 1, 2012, Dr. MacKinnon recommended plaintiff refrain from any overhead or heavy activities. She opined it would be a year before he experienced significant results from his surgery. (Tr. 361.) On January 17, 2013, Dr. MacKinnon observed that plaintiff showed some neuromuscular connections across the nerve transfer. Plaintiff still experienced subjective pain involving the entire left upper extremity, however, from his neck down into his hand. Dr. MacKinnon stated plaintiff was very depressed. She recommended he discuss his depression with his primary care physician and undergo a physical therapy evaluation. (Tr. 434.) In a correspondence with Dr. Wong dated April 29, 2013, Dr. MacKinnon stated plaintiff's pinch-and-grab on the right was 28 and 90 pounds and his pinch-and-grab on the left was 16 and 15 pounds. Plaintiff could externally rotate his left arm to 90 degrees, but he was strong when he did so. Dr. MacKinnon opined plaintiff had reinnervated across the suprascapular nerve, but she was unable to "get a good examination of his shoulder because of his pain." (Tr. 541.)

On February 11, 2013, plaintiff attended a pain management consultation with Dr. Tina Doshi. Dr. Doshi recommended plaintiff continue his hydrocodone and prescribed a trial of gabapentin and nortiptyline for his neuropathic pain. She also prescribed plaintiff Lidocaine jelly for left supraclavicular sensitivity. (Tr. 444–46.)

On April 12, 2013, an MRI of plaintiff's cervical spine revealed hemangioma in the C3 vertebral body with no other significant abnormalities. (Tr. 529.)

Plaintiff presented to Washington University Orthopedics on April 16, 2013 with a chief complaint of arm pain with numbness. On physical examination, plaintiff demonstrated 4/5 triceps strength and only 30 degrees of elevation of the left shoulder. He had weakness in the left external rotator with the ability to rotate out of 90 degrees. Plaintiff had atrophy in the left upper arm and limited motion of the left shoulder. (Tr. 543-46.)

8

Dr. Fonn from Midwest Neurosurgeons, LLC treated plaintiff in May and July of 2013 upon Dr. Wong's referral. (Tr. 537–40.) He opined plaintiff had thoracic outlet syndrome and possible C6 cervical radiculopathy. Dr. Fonn recommended plaintiff have a course of three CESIs at the C6/7 level and see a neurologist for his thoracic outlet syndrome. (Tr. 540.)

On January 16, 2014, plaintiff received an MRI of his left shoulder. The images showed unchanged moderate left supraspinatus and infraspinatus, and mild left subscapularis tendinopathy without discrete tear; unchanged moderate left acromioclavicular osteoarthritis; unchanged moderate left glenohumeral osteoarthritis; and unchanged mild tendinopathy of the left intraarticular long head of the biceps tendon. A possible slight resolution of fatty atrophy of the left teres minor muscle belly was also present. (Tr. 519.) An MRI of plaintiff's right shoulder demonstrated moderate right supraspinatus and infraspinatus and mild right subscapularis tendinopathy without discrete tear; mild right acromioclavicular osteoarthritis with mild subacromial subdeltoid bursitis; and minimal right glenohumeral chondrosis. Minimal fatty atrophy of the right teres minor muscle belly, suggestive of quadrilateral space syndrome, was also present. (Tr. 524.)

Plaintiff treated with Dr. David Lee at Neurologic Associates of Cape Girardeau for pain management from June 2013 through May 2014. (Tr. 473–77.) At the initial consultation on June 6, 2013, Dr. Lee noted plaintiff was remarkable for tenderness over the left lateral neck and shoulder. Plaintiff also had a mild impairment of pinprick sensation over the left shoulder area, atrophy and weakness of the left supraspinatus and infraspinatus, an inability to fully elevate the left arm, and symmetrical deep tendon reflexes and flexor plantar responses. Dr. Lee opined plaintiff's history suggested Personage-Turner Syndrome, with primary involvement of the left suprascapular nerve. He prescribed a trial of Tegretol. (Tr. 482-87.) On February 18, 2014, plaintiff denied significant drowsiness during the day. (Tr. 474.) On May 20, 2014, Dr. Lee

noted plaintiff was taking hydrocodone, Tegretol, and Flexeril. Plaintiff could not tolerate a higher dosage of Tegretol due to drowsiness. Plaintiff demonstrated mild-to-moderate weakness of the proximal left arm muscles and moderate limitations of motion at the left shoulder joint. Dr. Lee opined plaintiff could not return to his previous job and advised him to apply for Social Security benefits. (Tr. 450-51, 482.)

Dr. Gemo Wong treated plaintiff as his primary care physician throughout the relevant period. (Tr. 491–511.) On August 11, 2014, Dr. Wong concurred with Dr. Lee's recommendation and opined plaintiff was unable to work.

### 3. State-Agency Consultative Examinations

Dr. Adrian Feinerman completed a consultative examination of plaintiff on October 29, 2012. He stated plaintiff was "felt to be reliable." On physical examination, plaintiff was able to sit, stand, walk, hear, and speak normally. His ability to lift and carry with the left upper extremity was impaired. Dr. Feinerman concluded plaintiff had moderate difficulties performing the following tasks with his left hand: opening a door with a knob; squeezing a "BP cuff bulb;" picking up a coin; picking up and holding a cup; picking up a pen; buttoning and unbuttoning; zipping and unzipping; tying shoelaces; and turning pages. Plaintiff demonstrated grip strength of 4/5 in his left hand. His flexion of his right shoulder was 126/150; abduction was 96/150; adduction was 20/30; internal rotation was 70/80; and external rotation was 70/80. Plaintiff would not move his left shoulder for the range of motion evaluation. (Tr. 419–28.)

Dr. B. Rock Oh conducted a records review on November 2, 2012. (Tr. 78-80.) He opined plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push and/or pull an unlimited amount. (Tr. 79.)

Dr. Pardo conducted a records review on April 3, 2013, and concluded plaintiff could

10

occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push and/or pull an unlimited amount. (Tr. 91–92.)

    **4.    The Evidentiary Hearing**

ALJ Janney conducted an evidentiary hearing on December 1, 2014, at which plaintiff was represented by counsel. (Tr. 30–72.)

Plaintiff testified he was forty-five years old at the time of the hearing. (Tr. 35.) He took hydrocodone and Tegretol every day, which caused drowsiness, dry mouth, and fatigue, and hindered his ability to accomplish tasks. (Tr. 45–46.) Plaintiff was unable to dress without his wife's assistance because he could not raise his arms above his shoulders. He also had difficulty shaving and washing his back and hair. He could not use his left hand to hold a knife or fork. (Tr. 46–47.) He was unable to prepare meals or do housework because of pain. (Tr. 47–48.)

Plaintiff testified he could move his left arm but was unable to lift a cup of coffee to his mouth. He was limited to moving his left arm from his waist out. He strained his right arm due to overcompensation for the left arm. Plaintiff stated he had "most motor functions" in his right hand and could lift five pounds with his right arm. (Tr. 48–50.)

Plaintiff worked as a brick setter for Cast in Clay Products in 1999 and 2000. His job duties included carrying a dye, which weighed fifty-pounds. In 2000, plaintiff worked for Pepsi Mid-America, where he loaded a truck and delivered soda products. He lifted, at most, fifty pounds. Plaintiff then worked for William Dill in 2001 and 2002 as a heavy operator, truck driver, and grain deliverer. He lifted approximately fifty pounds. (Tr. 38–39.) After this, plaintiff worked at Dry Kilns in the lumberyard. In 2006 and 2005, plaintiff worked at Fitzgerald Marine and Repair where he was a crane operator and ran the cleaning crew. He lifted up to thirty-five pounds. Plaintiff also utilized foot and hand controls to operate the crane. In

2006 and 2007, plaintiff worked at Mars Pet Care as a mill room operator. He was on his feet "24/7." Plaintiff worked at James Marine in 2008 and 2009 as a welder and fitter. This also entailed operating a crane. (Tr. 40–43.)

Plaintiff experienced regular shooting pain into his right buttock, which he described as "immobiziling." When the pain arose, plaintiff had to sit down or grab on to something or else he would fall to the ground. Plaintiff could walk sixty feet at a time and sit approximately thirty minutes before switching positions. (Tr. 51–52.)

Plaintiff also had a hemangioma on the left side of his neck. The brace he wore for his left arm placed pressure on his neck. His left arm came out of socket and plaintiff did not do anything without the brace. His conditions limited the range of motion in his neck and also caused pain. (Tr. 52–53.)

Dr. James Bordiere, a vocational expert, testified regarding several hypothetical individuals and their ability to maintain employment. The first individual could perform light work; could never reach overhead with the bilateral upper extremities; could frequently reach in all other directions with the bilateral upper extremities; and could frequently handle and finger with the bilateral upper extremities. The VE opined this person could not perform any of plaintiff's past work. (Tr. 66–67.)

The second hypothetical individual had the same limitations described in hypothetical one, but was also in the younger age category, had a high school education, and shared plaintiff's past relevant work experience. The VE opined this person could perform jobs that existed in the economy. (Tr. 67–68.)

The third hypothetical individual was limited to light work and, with the non-dominant left upper extremity, could: lift and carry ten pounds occasionally and less than ten pounds frequently; could never reach overhead with the bilateral upper extremities; frequently reach in

all other direction with the right or dominant upper extremity; occasionally reach in all other directions with the non-dominant left upper extremity; frequently handle and finger with the right upper extremity; and only occasionally handle and finger with the non-dominant left upper extremity. This VE stated this individual could perform jobs that existed in the economy. (Tr. 68.)

The next hypothetical individual could use the right upper extremity to lift and carry ten pounds occasionally; use the non-dominant left upper extremity to lift and carry less than ten pounds frequently; and could never lift, carry, push, or pull any weight; never reach overhead with the bilateral upper extremities; frequently reach in all other directions with the dominant right upper extremity; occasionally reach with the non-dominant left upper extremity; and occasionally handle and finger with the non-dominant left upper extremity. The VE opined this person would be limited to sedentary, unskilled work. (Tr. 69–70.)

The VE stated employees are expected to be at work for the entire workday and remain productive for essentially the entire period. This would be even more prevalent during an initial sixty or ninety-day period following a hire. If a person had to be absent three to four days per month due to pain or medication side effects, he or she would be unable to maintain a job. If an individual could not sit for more than thirty minutes or stand for more than ten to fifteen minutes without taking a break, he or she would not be able to maintain of the jobs the VE previously identified. (Tr. 70–71.)

## Analysis

Plaintiff asserts that the ALJ's RFC determination was erroneous because the ALJ (1) ignored opinions from plaintiff's treating physicians; (2) failed to identify the evidentiary basis for the RFC assessment; and (3) did not incorporate plaintiff's subjective complaints in the RFC.

   1.   **Opinions from the Treating Physicians**

Plaintiff first argues the ALJ improperly ignored "the physical limitations placed on Plaintiff by his treating physicians" along with their opinions that plaintiff was unable to work. (Doc. 20, p. 20.) Dr. Wong, Dr. Lee, and Dr. MacKinnon each opined that plaintiff was unable to return to work. A statement that a claimant is unable to work is not a medical opinion, however, pursuant to 20 C.F.R. § 404.1527(d). Rather, whether a claimant meets the statutory definition of a disability is an issue reserved to the Commissioner. The ALJ noted the same in his analysis, but gave "great weight" to treating source statements that actually constituted "medical opinions" as defined in the regulations.[2] For instance, the ALJ adopted Dr. MacKinnon's opinion that plaintiff could not reach overhead or engage in "heavy activities." (Tr. 21.) Moreover, plaintiff does not identify any physical limitations that a treating source placed on him that the ALJ ignored. Because a physician's opinion regarding a claimant's ability to work is not a medical opinion entitled to deference, the ALJ properly weighed the treating source opinions in the record.

### 2. Evidentiary Basis for the RFC Assessment

Plaintiff next contends that the ALJ failed to identify the evidentiary basis for the RFC assessment. The "substantial evidence" standard mandates "only a minimal level of articulation by the ALJ," which means "enough to show that the ALJ considered the evidence the law requires him to consider." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).

Here, ALJ Janney provided a thorough discussion of the medical records. He noted the MRIs and physical examinations and explained that they supported plaintiff's allegations of difficulty with overhead reaching, but also that they demonstrated plaintiff was capable of light work with additional limitations. (Tr. 20.)

---

[2] "Medical opinions are statement from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

Plaintiff also, however, asserts the ALJ impermissibly interpreted the medical evidence, citing *Suide v. Astrue*, 371 F. App'x 684 (7th Cir. 2010) and *Rohan v. Chafer*, 98 F.3d 966 (7th Cir. 1996) for the proposition that an RFC assessment must derive directly from a medical source opinion. This argument is incorrect. First, The regulations vest the ALJ with authority to determine the plaintiff's RFC by weighing the evidence in the record, 20 C.F.R. § 404.1527. The Seventh Circuit has reiterated this as well. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.").

Moreover, Plaintiff's cited authorities do not apply. In *Rohan* and *Suide*, the ALJ simply ignored medical evidence. The ALJ does not commit that error here. ALJ Janney rejected portions of the state-agency consultants' opinions because they did not articulate plaintiff's limitations with overhead reaching and, instead, adopted Dr. MacKinnon's more restricted assessment. In crafting the remaining portions of the RFC determination, the ALJ utilized the record, which did not contain any opinion evidence suggesting plaintiff had a more restrictive RFC than the one the ALJ determined.

3.  **Plaintiff's Subjective Complaints**

Next, plaintiff contends that the ALJ did not adequately consider plaintiff's complaints of pain and the side effects of his medications. Plaintiff testified that drowsiness from his medications prevented him from doing "anything" throughout the day. He also alleged that he suffered from disabling pain.

Because "an ALJ is in the best position to determine the credibility of witnesses[,]" a court must review that determination deferentially and disturb it only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In assessing a plaintiff's subjective complaints, an ALJ must consider "the type, dosage, effectiveness, and side effects of any

medication the individual takes . . . ." SSR 96-7p.

Here, ALJ Janney did not specifically address plaintiff's testimony regarding the side effects of his medications. The ALJ, however, is not required to exhaustively discuss the record—including the side effects of medication—so long as he does not ignore an entire line of evidence contrary to his ruling. *Labonne v. Astrue*, 341 F. App'x 220, 226 (7th Cir. 2009).

Additionally, the ALJ referred to plaintiff's complaints of pain and generally noted plaintiff's pain medication in his discussion of the medical evidence. The ALJ ultimately found plaintiff not entirely credible, and although the determination was far from flawless, it was not patently wrong. The ALJ, for example, found it suspicious that plaintiff was "very anxious to go back to horseback riding." ALJ Janney noted, "[T]he claimant's pain did not appear to limit his desire to ride." (Tr. 19). Plaintiff's *desire* to engage in activities is not indicative of his *ability* to do so, and the ALJ's reasoning is a reach, at best. The ALJ also cast doubt on plaintiff's credibility because he refused to participate in testing, in reference to an evaluation where plaintiff could not lift his left arm beyond 90 degrees due to pain. (Tr. 21). It is unclear how this contradicted plaintiff's allegations of pain rather than corroborated them.

Nonetheless, the ALJ offered other logical reasons for the credibility determination, such as plaintiff's inconsistent statements about his ability to follow instructions and participate in physical therapy and his increased allegations of limitations despite unchanged MRIs. (Tr. 19). Since the ALJ offered "specific reasons for the finding on credibility, supported by the evidence in the case record," the ALJ's determination was not patently wrong. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting SSR 96-7p). In sum, although the ALJ did not specifically address the side effects of plaintiff's medications, the ALJ's opinion indicates he considered plaintiff's subjective complaints in making the credibility determination, which was not erroneous.

As a final matter, plaintiff asserts the ALJ erred in accepting the VE's opinion regarding the number of jobs available to the hypothetical individuals. Plaintiff forfeited this argument, however, when he failed to raise an objection at the hearing. *Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016).

## Conclusion

The Commissioner's final decision denying Terry Ditterline's application for social security disability benefits is **AFFIRMED**. The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**
**DATE: September 20, 2017**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**